**CRESWELL TRADING CO., INC. SOUTH BAY FOUNDRY 1989, D & L Supply Co., Southern Star, Inc., City Pipe & Foundry, Inc., Capitol Foundry of Virginia, Inc., Virginia Precast Corp., and Techsales, Inc., Plaintiffs,**

**Crescent Foundry Co. P. Ltd., Select Steels, Ltd., RSI (India) Pvt. Ltd., Kejriwal Iron & Steel Works, Govind Steel Co., Ltd., R.B. Agarwalla & Co., Serampore Industries P. Ltd., Super Castings (India), Carnation Enterprises P. Ltd., UMA Iron & Steel Co., and Commex Corp., Plaintiff–Intervenors,**

v.

**UNITED STATES, Defendant,**

**Allegheny Foundry Co., Campbell Foundry, Co., Deeter Foundry, Inc., East Jordan Iron Works, Inc., Lebaron Foundry, Inc., Municipal Castings, Inc., Neenah Foundry Co., Pinkerton Foundry, Inc., U.S. Foundry & Manufacturing Co., Vulcan Foundry, Inc. and Alhambra Foundry, Inc., Defendant–Intervenors.**

**Slip Op. No. 96–137.**
**Court No. 91–01–00012.**

United States Court of
International Trade.

Aug. 15, 1996.

Manatt, Phelps & Phillips (Irwin P. Altschuler and Ronald M. Wisla) and White & Case (Walter J. Spak and Vincent Bowen), Washington, DC, for plaintiffs.

Cameron & Hornbostel (Dennis James, Jr.), Washington, DC, for plaintiff-intervenors.

Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, (Velta A. Melnbrencis) and Robert E. Nielsen, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, of counsel, Washington, DC, for defendant.

Collier, Shannon, Rill & Scott (Paul C. Rosenthal and Robin H. Gilbert), Washington, DC, for defendant-intervenors.

## MEMORANDUM OPINION AND ORDER

DiCARLO, Chief Judge:

Plaintiffs, Plaintiff–Intervenors and Defendant–Intervenors move for a third remand, contesting certain aspects of the Department of Commerce's second remand determination countervailing certain portions of the subsidy provided to Indian castings exporters under India's International Price Reimbursement Scheme (IPRS). *Final Results of Redet. Pursuant to Court Remand, Creswell Trading Corp., Inc. et al. v. United States,* Slip Op. 94–65 (Dep't Comm. Feb. 13, 1995) [hereinafter *Second Remand Determination*]. This court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1988) and 19 U.S.C. § 1516a(a)(2)(B)(iii) (1988).

## BACKGROUND

In *Creswell Trading Corp. v. United States,* 783 F.Supp. 1418 (Ct.Int'l Trade 1992) [hereinafter *Creswell I*], the initial issue faced by this court was whether Commerce appropriately determined that India's IPRS program was countervailable. 783 F.Supp. at 1419. Under the program, the Indian government provided a payment to users of domestically-produced pig iron upon export of their finished products, such as iron castings. This payment reimbursed the dif-

ference between the more expensive domestic pig iron being used and the lower priced pig iron available on the world market. Plaintiffs claimed the IPRS program was not a countervailable subsidy, pointing to Item (d) of the Illustrative List of Export Subsidies annexed to the Agreement on Interpretation and Application of Articles VI, XVI, and XXIII of the General Agreement on Tariffs and Trade, which defines a subsidy as follows:

> (d) The delivery by governments or their agencies of imported or domestic products or services for use in the production of exported goods, on terms or conditions more favourable than for delivery of like or directly competitive products or services for use in the production of goods for domestic consumption, *if (in the case of products) such terms or conditions are more favourable than those commercially available on world markets to their exporters.*

783 F.Supp. at 1420 (quoting H.R.Doc. No. 153, Pt. I, 96th Cong. 1st Sess. 295 (1979) (emphasis added)). Congress has incorporated the Illustrative List, including Item (d), into United States law by 19 U.S.C. §§ 2502(1) and 2503(c)(5) (1988). *See Creswell Trading Co. v. United States,* 15 F.3d 1054, 1057 n. 4 (Fed.Cir.1994) (noting incorporation) [hereinafter *Creswell III*].

Plaintiffs argued that the IPRS program only reimbursed the difference between the prices of pig iron in the domestic and world markets. Commerce reasoned that, regardless of such reimbursement limitations, the program was still countervailable as a subsidy under U.S. law. This court remanded the case, instructing Commerce to assess the IPRS program in light of the exception to countervailable subsidies—the "if" clause—contained in Item (d).

On remand, Commerce explained that Indian information regarding international prices was unclear, and determined that the record evidence was "ambiguous" and "woefully deficient" to establish the IPRS program was non-countervailable pursuant to Item (d). *Redetermination on Remand: Final Results of Countervailing Duty Admin-*

*istrative Review Pursuant to Court Remand; Certain Iron–Metal Castings From India* (C–533–063) at 4 (Dep't Comm. Mar. 16, 1992). This court upheld the determination, emphasizing the Indian government had failed to carry its burden to establish a singular world market price during the relevant period. *Creswell Trading Co. v. United States,* 797 F.Supp. 1038, 1040–41 (Ct.Int'l Trade 1992) [hereinafter *Creswell II* ].

The Court of Appeals for the Federal Circuit (CAFC) in *Creswell III* reversed and remanded the case. The CAFC reasoned that Commerce had the burden of proof to establish by a preponderance of the evidence the statutory condition established by the "if" clause of Item (d)—*i.e.,* Commerce had the ultimate burden of persuasion in convincing a fact finder of the existence of a countervailable subsidy. *Creswell III,* 15 F.3d at 1060–61. The CAFC held that while Commerce had satisfied its burden of production by establishing the existence of the IPRS program, the burden shifted back to Commerce when respondents produced evidence that the pig iron was not provided on terms or conditions more favorable than available on world markets. *Creswell III,* 15 F.3d at 1061. The CAFC determined that Commerce had not met its burden of demonstrating that respondents' information was either inaccurate or insufficient, and that it was procedurally unfair for Commerce to find that the world price information on record was "ambiguous" and "woefully deficient" without allowing respondents an opportunity to supplement the record. *Creswell III,* 15 F.3d at 1059, 1062. The CAFC further noted that Commerce had made no attempt to determine any price at which pig iron could be purchased on international markets during the relevant review period. *Creswell III,* 15 F.3d at 1061.

In the present remand, Commerce determined that although the basic terms and conditions of the provision of pig iron under the IPRS *program* were not more favorable than those commercially available internationally, the IPRS *rebates* were excessive in two respects. *Second Remand Determination* at 3–4. Commerce explained that the Government of India (1) neglected to include ocean freight in calculating a world market price and (2) neglected to factor out the use of scrap in its calculation of IPRS rebate payments. *Id.* at 4. Commerce found the "excessive" portion of the IPRS reimbursements did not meet the Item (d) exception and were countervailable. *Id.* This appeal followed.

## DISCUSSION

The ultimate burden of proving countervailability under Item (d) rests with Commerce. *Creswell III,* 15 F.3d at 1056. Therefore, in reviewing these determinations, the court must consider if (1) Commerce has carried its burden of production and produced sufficient evidence to argue the rebates were excessive and (2) if so, whether Commerce has proven by a preponderance of the evidence that the rebates were excessive. *Creswell III,* 15 F.3d at 1060–61. The CAFC has simultaneously instructed that the court is furthermore guided by the statutory standard of review which provides the court's role is to uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988); *see also Creswell III,* 15 F.3d at 1056 (providing standard of review). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). Although (1) a deferential, substantial evidence standard applied to Commerce as the trier of fact and (2) a preponderance of the evidence standard imposed as if Commerce were a party plaintiff or defendant appear facially inconsistent, the court has endeavored to apply both standards pursuant to the CAFC's instructions.

### 1. Commerce's Item (d) Examination Methodology

Defendant–Intervenors challenge the *Second Remand Determination* as flawed. Defendant–Intervenors argue Commerce failed to comply with *Creswell III,* because

Commerce blindly accepted the Indian government's benchmark world prices. (Dom.Ind.Comments on Results of Redet. on Remand at 3.) According to Defendant–Intervenors, Commerce failed to examine whether the Indian government provided pig iron to exporters on terms or conditions more favorable than those commercially available on world markets to its exporters. *Id.* at 5. They argue Commerce erred in looking only at whether the Indian government applied a consistent, updated calculation methodology for determining rebate figures, rather than looking towards the actual terms and conditions at which pig iron could be purchased on the world market. *Id.*

The court disagrees that Commerce employed an improper methodology in determining whether the IPRS program falls within the Item (d) exception. In conducting its present remand determination, Commerce issued additional questionnaires to the Indian government and Indian castings exporters, and conducted verification of the various price and other submitted information. (*See, e.g.,* Mem. for Barbara E. Tillman of 12/19/94) [hereinafter *Gov't of India Verification* ]. Commerce furthermore reviewed Indian import transaction figures to assess the comparability of the world price for pig iron with the IPRS world price benchmark for pig iron. *Second Remand Determination* at 11; (*see* Letter from Counsel to Dom.Ind. to Commerce of 12/9/94) (placing Indian import statistics on the record). After such analysis, Commerce determined that the IPRS world price benchmark was deficient in one respect because the IPRS benchmark failed to account for ocean freight costs as allegedly required by Item (d). *Second Remand Determination* at 9.

The record reveals Commerce conducted numerous verifications and did not passively accept Indian world price information. Commerce went beyond looking merely at consistency in the IPRS calculation methodology to include an investigation of the actual terms and conditions at which pig iron could be purchased on world markets. This is most readily supported by Commerce's rejection of the Indian government's preferred IPRS benchmark price in favor of a benchmark

price inclusive of freight, a decision which, in part, prompted the present appeal. *Second Remand Determination* at 3–5.

Nevertheless, Defendant–Intervenors claim data on the record reveals IPRS world prices established by both the Indian government and Commerce, whose benchmark is based on the Indian government's world price figures, were artificially derived and were not based on terms or conditions commercially available on world markets to Indian exporters. (Dom.Ind. Comments on Results of Redet. on Remand at 7–30.) More specifically, Defendant–Intervenors challenge the accuracy of the IPRS world benchmark price figures, arguing that even the Indian government's own data calls into question the validity of India's world price figures. *Id.* at 7–20. Defendant–Intervenors assert an average value of pig iron prices derived from Indian import statistics would be a more appropriate benchmark measure of the world price for pig iron, rather than the lowest prices at which pig iron was available on the world market. *Id.* at 21.

The court disagrees that data from the Indian government reveals that IPRS world prices were not based on terms or conditions for pig iron commercially available on world markets to Indian castings exporters. The record indicates Commerce analyzed information to verify the accuracy and reliability of Indian government and exporters' price data. Through its investigation, Commerce found that pig iron was not traded on international exchanges and thus had no recognized world price. *See Gov't of India Verification* at 4 (noting pig iron is not traded on international exchanges); *see also Creswell III,* 15 F.3d at 1058, 1061 (again noting no international price for pig iron). The Indian government, however, used both actual contracts for imported pig iron as well as other documentation demonstrating the terms and conditions at which various grades of pig iron were available from foreign markets in order to determine an appropriate international price benchmark. *Gov't of India Verification* at 3–4; *Second Remand Determination* at 11, 14–17; *see also Creswell III,* 15 F.3d at 1058 (*quoting* India's Questionnaire Resp. of Aug. 26, 1987, at 14–15.) Commerce also

verified that the international benchmark price was revised on a regular basis to account for fluctuations in the exchange rate and new import contracts made by the Steel Authority of India and the parastatal Mines and Mineral Trading Company. *Gov't of India Verification* at 4. Based upon a review of the administrative record, the court finds Commerce's decision to regard Indian price information as an accurate and reliable basis for constructing a world price benchmark is supported by substantial evidence and is in accordance with law.

■ That Defendant–Intervenors derived a different world price benchmark from Indian government figures does not change this conclusion. Defendant–Intervenors argue that Commerce should have established an IPRS benchmark based on an average of all pig iron prices, rather than limiting its range to the lowest available prices. (Dom.Ind.Comments on Results of Redet. on Remand at 20–23.) They assert such averaged prices are significantly higher than the international prices used by Commerce to determine the appropriate IPRS benchmark. *Id.* at 8–9 & Attach. IV.

■ Item (d) simply speaks of terms or conditions "commercially available" to a country's exporters on the world market. Item (d) does not explicitly provide that a price term that is commercially available must be an average of all commercially available prices. Indeed, it would stand to reason that a buyer would select the lowest price among all prices that were quoted on world markets. Furthermore, it is well-settled that "[a]n agency's interpretation of a statute is entitled to deference where neither its express language nor the legislative history tells how Congress intended an issue to be decided." *Zenith Elecs. Corp. v. United States,* 77 F.3d 426, 432 (Fed.Cir.1996). Therefore, the court finds Commerce's decision to determine the appropriate IPRS benchmark on the basis of a lower range of commercially available prices, rather than an average of all prices, to be within its discretion and supported by substantial evidence on the administrative record.

## 2. Ocean Freight Costs

■ Commerce found that the Indian IPRS world price benchmark did *not* include ocean transportation costs. *Second Remand Determination* at 4. Plaintiffs and Plaintiff–Intervenors do not dispute this fact. (Pls.' Comments on Agency's Final Remand Results at 6–8; Pl.–Ints.' Comments on Results of Remand at 2–3.) Commerce argues that Item (d) requires that such costs must be included within the world price when determining a permissible—*i.e.,* noncountervailable—rebate payment. *Second Remand Determination* at 4–5. Commerce explains a rebate is noncountervailable so long as the provision of inputs is not on terms or conditions more favorable than those commercially available on world markets to their exporters. *Id.* at 4. Commerce claims the phrase "to their exporters" dictates that shipping costs be included, because Indian iron castings exporters who purchase pig iron internationally would necessarily incur costs of transporting the product to India. *See id.* (noting Item (d) is concerned with a government's provision of goods to exporters). Because those ocean freight costs were not included, Commerce concluded IPRS rebates received by the Indian exporters were excessive by the amount of the delivery charges necessary to ship pig iron to India. *Id.* at 4–5. Commerce therefore determined this excess rebate constituted a countervailable subsidy, because it placed the Indian exporters in a more favorable position than if the exporters had purchased pig iron at the commercially available world market price—*i.e.,* a price inclusive of ocean freight. *Id.*

This court must accord substantial weight to an agency's interpretation of statutes it administers. *American Lamb Co. v. United States,* 785 F.2d 994, 1001 (Fed.Cir.1986). However, "[t]he traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress." *Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.,* 474 U.S. 361, 368, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986). As the CAFC has explained, "Item (d) sets forth on its face" that Commerce must first assess whether the Indian government has delivered pig iron to its

exporters on terms or conditions more favorable than terms or conditions commercially available to the exporters on world markets before Commerce may impose a countervailing duty in this case. *Creswell III*, 15 F.3d at 1060. In carrying out this statutory requirement, Commerce has determined that the exclusion of ocean shipping costs has provided Indian exporters with an excessive IPRS rebate and constitutes a term or condition more favorable than commercially available on world markets. *Second Remand Determination* at 4.

The CAFC has stated that the very language of Item (d) requires a comparison in this case between the terms or conditions by which pig iron is provided to Indian castings exporters and the terms or conditions at which pig iron is commercially available to the same Indian exporters on world markets. *Creswell III*, 15 F.3d at 1060. During the relevant review period, the Indian government provided pig iron to exporters at a relatively high domestic price, but subsequently issued rebates to reimburse castings exporters. *Second Remand Determination* at 1–2. The ultimate result of this practice was that the net price of the pig iron was equivalent to the lower, FOB world price of pig iron, a price that did not include ocean freight costs. *See Creswell III*, 15 F.3d at 1058, 1061 (describing calculation). According to the CAFC, the world price chosen by India represented the price at which "the Indian government believed it could purchase pig iron internationally." *Creswell III*, 15 F.3d at 1058.

Commerce does not challenge the accuracy of the FOB price figure *per se*. Indeed, it concedes that the FOB price is a fair representation of the world price. *Second Remand Determination* at 12. Rather, Commerce asserts Item (d) requires that shipping costs be added to the chosen FOB price figure to ascertain the total costs Indian exporters would incur in actually making foreign pig iron commercially available to them. *Id.*

The Indian government's "pig iron package" provided pig iron as well as domestic delivery at a net price equivalent to the FOB world price. *Gov't of India Verification* at 3–5. By way of comparison, foreign pig iron sources would have provided only undelivered pig iron for the world price—*i.e.*, an FOB price. Neither Indian inland freight nor ocean freight would be included in the FOB price.

In comparing the Indian "pig iron package" with a foreign FOB "pig iron package," it becomes clear that the terms or conditions at which the Indian government delivered pig iron to its exporters were not more favorable by the value of ocean freight, because ocean freight was not a term or condition offered by the Indian government in its "pig iron package." Since the Indian government was offering pig iron *being produced in India*, there would be no need to include an ocean freight term or condition for delivery to Indian exporters. Therefore, ocean freight would be a term or condition irrelevant to the FOB price-based Item (d) comparison at hand.

This result does not change, even if the court were to adopt the argument that the appropriate price comparison is between the Indian government's pig iron price and a foreign pig iron price inclusive of shipping. If one compares the Indian government's pig iron package with a foreign pig iron package inclusive of shipping, the results are as follows:

*Indian government's pig iron package:* for the world FOB pig iron price, the Indian castings exporters receive pig iron plus domestic delivery.

*Foreign pig iron package:* for the world FOB price plus ocean freight, Commerce's higher total price calculation, the Indian exporters would be entitled to foreign pig iron plus ocean freight.

In such a comparison, it is still apparent that the Indian government is not providing its castings exporters with pig iron on a term or condition more favorable by an amount equal to ocean freight. Ocean freight is simply not a part of the pig iron package being offered by the Indian government because, as noted earlier, the pig iron being offered is produced in India, obviating the need for ocean shipping. If the Indian government had instead imported the pig iron from overseas and delivered it to its castings exporters at the

world FOB price, that could be a situation in which the "free ocean delivery" of pig iron would have been a term or condition more favorable than commercially available to the castings exporters on world markets. Of course, this is not the case here.

A comparison of the Indian government's pig iron package with the foreign pig iron package indicates the Indian government provided domestic delivery as well as pig iron at the world price. Foreign suppliers were not including domestic delivery for purchases of pig iron at the world price. Therefore, it would appear that the inclusion of domestic delivery at the FOB world price would be a term or condition more favorable than that commercially available to Indian exporters on world markets. Commerce, however, did not make such a finding. *Second Remand Determination* at 4–5. Rather, with respect to freight, Commerce determined simply that the Indian government's provision of pig iron was on terms or conditions more favorable than commercially available by the value of ocean freight, *id.*, a freight calculation that proves to be irrelevant under the facts as contained in the record in this case. As a result, the court finds that Commerce has not met its burden of proof with respect to showing whether, as the CAFC has required, "the IPRS rebates paid to exporters [exceeded] the difference between the domestic price of pig iron and the price at which [pig iron] could have been purchased internationally." *Creswell III*, 15 F.3d at 1061. The court therefore holds that Commerce's decision to impose a countervailing duty on the basis of the Indian government's non-inclusion of ocean freight in its world price benchmark is unsupported by substantial evidence and is not in accordance with law. The court further instructs Commerce to consider and explain whether the inclusion of inland freight made the Indian government's provision of pig iron more favorable than pig iron commercially available to Indian exporters on the world market. Upon making its determination as to whether the Indian pig iron package was more favorable by the value of domestic delivery, Commerce should revise its subsidy calculation accordingly. Should Commerce determine that the Indian pig iron package was not more favorable by the

value of domestic delivery, Commerce should clearly explain the basis for that determination.

### 3. Scrap Iron

■ Commerce also found that a second portion of the IPRS rebates were excessive, because that part of the rebates was attributable to consumption of scrap iron, not pig iron. Commerce found that both domestic pig iron and scrap iron were used to produce exported castings. *See Second Remand Determination* at 5. Scrap iron was not a product entitled to rebates under the IPRS program. Indeed, prior to October 1984, the Indian government used an IPRS rebate formula which was designed to account for the presence of scrap, and thereby rebate only pig iron consumption. *Id.* Beginning in October 1984, the Indian government began calculating rebate payments as if no scrap were used, even though Commerce discovered during verification that casting exporters continued to use scrap after October 1984. *Id.* at 5.

Neither Plaintiffs nor Plaintiff–Intervenors presently dispute the finding that the consumption of scrap iron was not entitled to IPRS rebates. (*See* Pls.' Comments on Agency's Final Remand Results at 14 (limiting argument to ocean freight issue); Pl.–Ints.' Rebuttal to Dom.Ind.'s Comments on Results of Redet. on Remand at 17.) Commerce determined this excess rebate would make the provision of pig iron more favorable than the terms and conditions commercially available on world markets to the Indian castings exporters.

Indian castings exporters were receiving more reimbursements than they were legitimately entitled to, based upon their actual pig iron consumption. *Second Remand Determination* at 5. Those excess rebates, therefore, essentially reduced the net price of pig iron to Indian castings exporters below the IPRS world price benchmark. This supports Commerce's conclusion that the excess rebates provided Indian castings exporters with pig iron on terms or conditions more favorable than those commercially available to its exporters on world markets. Based upon this finding, Commerce decided to

countervail this excessive portion of the IPRS rebates attributable to scrap iron, rather than countervail the rebates in their entirety. The court finds Commerce has sustained its burden of proof in showing that the IPRS rebates were excessive as a result of certain rebate payments supposedly made to reimburse pig iron consumption but actually attributable to scrap. The related issue of whether to countervail the excessive portion versus the entire rebate must now be addressed.

■ Defendant–Intervenors, relying upon *RSI (India) Pvt., Ltd. v. United States*, 687 F.Supp. 605 (Ct.Int'l Trade 1988), *aff'd*, 876 F.2d 1571 (Fed.Cir.1989), assert the court should countervail the entire rebate, arguing India's IPRS payments were not directly related to the amount of pig iron used in exported castings and that Commerce need not tinker with the IPRS to make it noncountervailable. (Dom.Ind.'s Comments on Results of Redet. on Remand at 23–24, 28–32.) Defendant–Intervenors further declare that because the Indian castings exporters, similar to the exporters in *RSI*, "*have not established an entitlement to an exception to [I]tem (d)*, [Commerce] has no choice in this case whether to countervail IPRS payments in full. It must do so." *Id.* at 32 (emphasis added).

Defendant–Intervenors' latter argument is contrary to the CAFC's directive in *Creswell III*, because the CAFC expressly noted that the Indian exporters did not bear the ultimate burden of showing that they were entitled to an exception under Item (d). Rather, Commerce had the ultimate burden of showing that the Indian castings exporters were not entitled to an exception under Item (d). According to the CAFC,

> [t]he "if" clause of Item (d) sets forth on its face a statutory condition that *Commerce must establish* before it may exercise its right to levy a countervailing duty against an investigated party, *as opposed to an exception into which that party must prove its actions fall.*

*Creswell III*, 15 F.3d at 1060 (emphasis added).

Whether *RSI* requires the court to countervail the entire rebate must now be considered. *RSI* involved Indian castings exporters that received IPRS rebates wholly out of proportion to their actual consumption of pig iron. *RSI*, 687 F.Supp. at 608, 611. In that case, the CAFC concluded Commerce "is under no legal duty to construct an *imaginary* noncountervailable subsidy when the real subsidy is not shown to have been constructed in any such way and can not be shown to be nondistortive of market forces." *RSI*, 876 F.2d at 1574 (emphasis added). Neither this court nor the CAFC held in *RSI* that Commerce could never calculate the actual amounts of pig iron consumption for which IPRS rebates were appropriate. *RSI* simply held that, in a situation where IPRS payments bore absolutely no relationship to actual consumption of pig iron, Commerce was under no *legal* duty to calculate the actual consumption of pig iron and the rebate amounts to which Indian exporters were legitimately entitled. *RSI*, 687 F.Supp. at 610–11; *RSI*, 876 F.2d at 1573–74. *RSI* does not preclude Commerce from making such calculations if Commerce deems it appropriate to do so.

Defendant explains Commerce determined the Indian government had a well-established program that consistently applied a clearly defined methodology. (Def.'s Resp. to Comments to Redet. on Remand at 13.) Commerce further found that certain portions of the IPRS rebates were greater than needed to equilibrate the domestic price for Indian pig iron to the world market price. *Id.* at 13–14. Commerce therefore determined that, under Item (d), "those excessive portions of the IPRS rebates represented terms or conditions more favorable than those commercially available to Indian exporters on the world market and, therefore, constituted countervailable subsidies." *Id.* at 14.

As discussed earlier, the record indicates Commerce conducted a careful examination of the terms and workings of the IPRS program to assess its consistency with the requirements of Item (d). *See, e.g.*, discussion *supra* at 8–9. Commerce was thereby able to estimate the excessive value of rebates which went beyond those justified under Item (d) to equilibrate domestic and international pig iron prices. Such an analysis

would amount to more than an "imaginary construction" criticized under *RSI*, especially since, as the CAFC has previously noted, "[w]e would be most reluctant to substitute our uninformed judgment for [Commerce's] expertise with respect to the economic effect of an undisputed 'bounty or grant,' and how much duty is necessary to countervail it." *RSI*, 876 F.2d at 1574.

Defendant furthermore argues that Commerce's decision to countervail only the excessive portion of the rebate was correct. Defendant argues that once the excessive portions of the rebate are deducted, "the balance of the rebates results in pig [iron] prices that are *not* more favorable than the pig [iron] prices that are available" internationally. (Def.'s Response to Comments to Redet. on Remand at 31.) Defendant therefore reasons only the excessive portions are properly countervailable.

The court agrees that Commerce's approach of calculating a subsidy on the basis of the excess portion of the IPRS rebates is within its discretion. To the extent the IPRS rebates did not result in pig iron being provided on terms or conditions more favorable than those commercially available on world markets, that portion of the rebate would not be considered a subsidy under the "if" clause of Item(d). Here, only the excessive portion of the rebate—*i.e.*, that portion of the rebate which results in pig iron being provided on terms or conditions more favorable than those commercially available on world markets—is properly considered a subsidy and countervailable.[1] The court therefore finds Commerce's methodology to countervail only those portions of the IPRS reimbursements that are excessive and beyond those needed to equilibrate the terms and conditions of Indian pig iron with pig iron available internationally is supported by substantial evidence and is in accordance with law.

**4. Country-wide Rate Calculation**

■ Plaintiff–Intervenors also argue that Commerce should be required to calculate the country-wide rate—rather than only separate *ad valorem* rates which are not the countervailing duty rates that Commerce will ultimately apply—prior to the dismissal of this action. (Pl.–Ints.' Comments on Results of Remand at 11.) Defendant contends it would be premature to require Commerce to calculate the country-wide rate before a final court decision on the IPRS issues has been made. (Def.'s Resp. to Comments to Redet. on Remand at 34.) Given the procedural history of this case, it is possible that, once Commerce prepares revised *ad valorem* rates as instructed by this opinion, the case could be remanded yet again. However, it is also possible that the court will sustain Commerce's revised *ad valorem* rates, at which point a look at Commerce's country-wide rate calculation would be appropriate. Once the *ad valorem* rates have been ascertained, Commerce will have to calculate a country-wide rate. Given this fact, the court does not believe it would be inappropriate or impose an undue burden upon Commerce to calculate a country-wide rate along with revised *ad valorem* rates. Upon remand, therefore, Commerce should calculate the appropriate country-wide rate it intends to apply in this case.

**5. Govind's Steel Subsidy**

■ Plaintiff–Intervenors additionally argue that Commerce erred in calculating Govind Steel's subsidy in a key respect. Commerce allegedly erred by attributing all of Govind Steel's 1985 IPRS payments to its 1985 exports, although much of the payment received in 1985 was for exports made in 1984. (Pl.–Ints.' Comments on Results of Remand at 12.)

Defendant contends Govind Steel's complaint that its subsidy is overstated is without merit. Commerce's practice is to allocate the amount of subsidy received in one year to the company's exports made during that year. (Def.'s Resp. to Comments to Redet. on Remand at 36–37.) Defendant explains Commerce followed this practice with respect to the IPRS program for all Indian exporters, and that an exception for Govind Steel is not warranted. *Id.; Second Remand Determi-*

---

**1.** As noted earlier, whether the Indian government's provision of inland freight comprises such an excessive portion of the rebate is to be determined upon remand.

*nation* at 18. In addition, Commerce has previously noted that any methodological change would result in a significant gap in the measurement of IPRS subsidies between review periods. *Certain Iron–Metal Castings From India: Final Results of Countervailing Duty Administrative Review*, 55 Fed.Reg. 50,747, 50,750 (Dep't Comm.1990). When Commerce calculated subsidies by allocating the amount of IPRS rebates received in 1984 to the company's exports made during that same year for the 1984 review period, the Indian exporters did not challenge the propriety of this methodology. *Id.* Therefore, Govind's 1984 rebate payments were applied to the total value of its exports in 1984. Plaintiff–Intervenors now ask Commerce to apply Govind's 1985 rebates over largely the same exports from 1984, claiming the rebates Govind received in 1985 were mainly derived from its exports in 1984. (Pl.–Ints.' Comments on Results of Remand at 12.) If Commerce were to make this methodological change, 1984 exports would essentially be "double-counted" for purposes of allocating rebate payments, thereby distorting the resulting subsidy calculation.

Commerce has broad latitude to implement the statutory scheme it is charged with administering, provided its implementation is reasonable, is in accordance with law, and follows expressed Congressional intent. *See Saarstahl AG v. United States*, 78 F.3d 1539, 1542, 1544 (Fed.Cir.1996) (noting "Commerce's construction must be sustained if it 'falls within the range of permissible construction.' ") Neither Item (d) nor 19 U.S.C. § 1675 (1988), which provides for administrative review of determinations, directly addresses the allocation methodology for benefits from a subsidy. This silence, therefore, leaves selection of an allocation methodology to the discretion of Commerce. *See Saarstahl*, 78 F.3d at 1544 (explaining "[i]n the absence of specific mandates ... Commerce's approach must be accorded deference.") Because Commerce maintained a consistent calculation methodology applied to all Indian exporters, the court finds Commerce did not abuse its discretion in declining to grant Govind an exception to Commerce's calculation methodology.

Plaintiff–Intervenors also claim Commerce improperly relied upon Govind's total pig and scrap iron consumption figures, rather than Govind's more narrowly tailored figures for its exported subject castings in determining Govind's excess rebate. (Pl.–Ints.' Comments on Results of Remand at 13–14.) Govind suggests that it used only pig iron and no scrap iron to produce its exported subject castings during the relevant review period. *Id.* Govind therefore argues Commerce should use Govind's pig iron and scrap iron consumption figures for exported castings, rather than its pig and scrap iron consumption figures for all domestic and export production.

The court is unconvinced. Plaintiff–Intervenors' arguments on this point are unclear and inconsistent. Plaintiff–Intervenors assert that "in 1983, '84, and '85 ... Govind consumed considerably more pig iron than would have been required to produce *all* the exported subject castings out of 100% pig iron." *Id.* at 13. That Govind consumed more pig iron from 1983–1985 than would have been required to produce all the exported subject castings over that period does not automatically substantiate Govind suggestion that it used no scrap iron to produce exported castings in 1985. After all, Govind's own production history shows that, despite allegedly large quantities of pig iron purchases, Govind also used significant quantities of scrap iron in its exported castings. For instance, in 1984, Govind's exported castings were composed of nearly one-third of scrap iron. *Id.* at Ex. 4. In 1983, its exported castings were composed of over one-third of scrap iron. *Id.* Even in the face of such figures derived from Govind's own numbers, Plaintiff–Intervenors inexplicably insist that Commerce's decision to employ Govind's total consumption figures rather than its more narrowly tailored figures "was not appropriate since *there is nothing in the record suggesting* that, contrary to Govind's submission, *the company used significant amounts of scrap* to produce the subject castings." *Id.* at 14 (emphasis added).

Plaintiff–Intervenors' inconsistent arguments provide no basis for challenging Commerce's use of Govind's total pig iron and

scrap iron consumption figures. Indeed, Commerce decided to use ratios derived from total pig and scrap iron consumption, because none of the Indian exporters verified could "verify the validity of the raw material breakdown it provided for [exported] subject castings." *Second Remand Determination* at 14. Under these circumstances, the court finds Commerce was within its discretion to apply a pig iron consumption ratio derived from Govind's total consumption figures of pig iron and scrap iron, rather than Govind's allegedly more accurate, narrowly tailored figures.

### 6. Clerical Error Regarding Wastage

Plaintiff–Intervenors finally allege that Commerce made a clerical error relating to wastage. (Pl.–Ints.' Comments on Results of Remand at 8.) Defendant concedes this mistake, and agrees a remand is necessary on this point to correct the error. (Def.'s Resp. to Comments to Redet. on Remand at 35–36.) Commerce should revisit the wastage calculation to ensure that the relevant calculations are consistent with the present findings and instructions of the court.

### CONCLUSION

Commerce's *Second Remand Determination* is sustained in part and remanded in part. In recalculating the subsidy rates on remand, Commerce shall eliminate its previous ocean freight cost adjustment to the IPRS benchmark pig iron price, consider and explain whether the IPRS benchmark pig iron price must be adjusted for inland freight costs, revisit the wastage calculation, and calculate a country-wide rate, in accordance with the specific instructions set forth in this opinion.

The remand results shall be filed with the court within 45 days from the date of this opinion. Any party contesting the remand results shall file comments within 30 days of the remand results. Commerce may file its response to any comments within 15 days of the filing of the comments.