## CRESWELL TRADING CO., INC., D & L Supply Co., Southern Star, Inc., City Pipe & Foundry, Inc., South Bay Foundry 1989, Capitol Foundry of Virginia, Inc., Virginia Precast Corp. and Techsales, Inc., Plaintiffs–Appellees,

### and

## Crescent Foundry Co. Pvt. Ltd., RSI (India) Pvt. Ltd., Select Steels, Ltd., Kejriwal Iron & Steel Works, R.B. Agarwalla & Company, Serampore Industries Pvt.

---

Ltd., Supercastings (India), Carnation Enterprises Pvt. Ltd., Uma Iron & Steel Co., Govind Steel Co., Ltd. and Commex Corporation, Plaintiffs–Appellees,

v.

ALLEGHENY FOUNDRY CO., Campbell Foundry Co., Deeter Foundry, Inc., East Jordan Iron Works, Inc., Lebaron Foundry Inc., Municipal Castings, Inc., Neenah Foundry Co., Pinkerton Foundry Inc., U.S. Foundry & Manufacturing Co., Vulcan Foundry, Inc., Alhambra Foundry, Inc., Defendants–Appellants,

and

United States, Defendant–Appellant.

Nos. 97–1486, 97–1487.

United States Court of Appeals, Federal Circuit.

April 16, 1998.

Dennis James, Jr., Cameron & Hornbostel, LLP, of Washington, DC, argued for plaintiffs-appellees. Of counsel was Michele C. Sherman. On the brief were Walter J. Spak, and Vincent Bowen, White & Chase, of Washington, DC.

Velta A. Melnbrencis, Assistant Director, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, of Washington, DC, argued for defendant-appellant, United States. With her on the brief were Frank W. Hunger, Assistant Attorney General and David M. Cohen, Director. Of counsel on the brief were Stephen J. Powell, Chief Counsel for Import Administration, Elizabeth C. Seastrum, Senior Counsel, and Robert E. Nielsen, Senior Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

Robert H. Gilbert, Collier, Shannon, Rill, & Scott, PLLC, of Washington, DC, argued for defendants-appellants, Allegheny Foundry Co., et al. Of counsel was Mary T. Staley.

Before RICH, LOURIE, and BRYSON, Circuit Judges.

LOURIE, Circuit Judge.

Allegheny Foundry, Co. et al. (the "Domestic Industry") and the United States appeal from the decision of the Court of International Trade in favor of Creswell Trading Co. et al. (the "Importers") affirming Commerce's determination that certain oceanic shipping costs and inland shipping costs did not constitute countervailable subsidies under "Item (d)" of the Illustrative List of Export Subsidies, annexed to the Agreement on Interpretation and Application of Articles VI, XVI, and XXIII of the General Agreement on Tariffs and Trade ("GATT Agreement").[1] *Creswell Trading Co. v. United States*, 964 F.Supp. 409 (Ct. Int'l Trade

1997). Because the court erred in its decision concerning the oceanic shipping costs but not as to the inland shipping costs, we affirm-in-part and reverse-in-part.

## BACKGROUND

In 1985, India's castings manufacturers needed pig iron to manufacture items for export. Because India's domestic pig iron manufacturers were selling pig iron at higher prices than manufacturers on the world market, the Indian government provided rebates to its castings manufacturers pursuant to its International Price Reimbursement Scheme (the IPRS program). These rebates were intended to enable Indian castings manufacturers to buy the more expensive domestically produced pig iron while still competing effectively in the world market. *See generally Creswell Trading Co. v. United States*, 15 F.3d 1054 (Fed.Cir.1994) ("*Creswell I*") (discussing the IPRS program in further detail).

The Indian government calculated the IPRS rebates as being equal to the domestic price of pig iron minus the world market price of pig iron. The Indian government's world market price did not include the cost of shipping pig iron procured on world markets to the port at Calcutta, India, nor did it include the inland shipping cost necessary to bring the pig iron from Calcutta to the plants of the Indian castings manufacturers. The world market price did however include the cost of shipping the pig iron by rail from the pig iron exporter's plant to its local port. Thus, the world market price used by the Indian government in the computation of rebates was a Free–On–Board (FOB) price, the price one would pay for the pig iron at the exporter's local port. The Indian government's domestic price included the cost of shipping pig iron from the plants of domestic pig iron manufacturers to Calcutta, but did not include the cost of delivery from Calcutta to the plants of the castings manufacturers.

---

1. At the time of the events in question, a "subsidy" was defined as including "[a]ny export subsidy described in Annex A to the [GATT] Agreement (relating to illustrative list of export subsidies)." *See* 19 U.S.C. § 1677(5) (1982 & Supp. III 1985). The Illustrative List is prepared under GATT which, by the operation of 19 U.S.C. §§ 2502(1) and 2503(c)(5), Congress incorporated into United States law. *See RSI (India) Pvt., Ltd. v. United States*, 876 F.2d 1571, 1572 (Fed.Cir.1989).

Thus, the domestic price used by the Indian government was FOB at Calcutta.

When the Importers in 1985 introduced castings manufactured under the IPRS program into the U.S. market, the Domestic Industry asserted that the rebates constituted countervailable subsidies. Specifically, they contended that the rebates were countervailable subsidies under Item (d), which defines a subsidy as follows:

(d) The delivery by governments or their agencies of imported or domestic products or services for use in the production of exported goods, on terms or conditions more favourable than for delivery of like or directly competitive products or services for use in the production of goods for domestic consumption, *if (in the case of products) such terms or conditions are more favourable than those commercially available on world markets to their exporters.*

(emphasis added). The Domestic Industry reasoned that under Item (d), the rebates constituted countervailable subsidies if the Indian government provided pig iron to its castings manufacturers on terms more favorable than those "commercially available on the world markets." They argued that the Indian Government's world market price was artificially low because it did not include the cost of shipping the pig iron to Calcutta. In short, they contended that a given rebate was excessive by the amount of the oceanic shipping costs, that the excessive amount allowed Indian castings manufacturers to procure pig iron on terms more favorable than those "commercially available on world markets," and therefore that this excessive amount was a countervailable subsidy under Item (d).

Commerce initially agreed that the Indian government should have included oceanic shipping costs in its world market price and therefore that these costs constituted countervailable subsidies under Item (d): "Indian exporters who purchase pig iron on the world market would necessarily also incur the cost of delivering the pig iron to India. Therefore the commercially available alternative [to the IPRS program] is the price of the pig iron itself, from sources outside of India, plus delivery charges to India." *Final Results of Redetermination Pursuant to Court Remand, Creswell Trading Co. v. United States,* at 4 (Dept. of Commerce Feb. 13, 1995) (*"Creswell II"*). Commerce rejected the Domestic Industry's alternative argument that the entire rebate was a countervailable subsidy.

The Court of International Trade disagreed with Commerce's oceanic shipping cost determination, and remanded, stating:

In comparing the Indian "pig iron package" with a foreign FOB "pig iron package," it becomes clear that the terms or conditions at which the Indian government delivered pig iron to its exporters were not more favorable by the value of ocean freight, because ocean freight was not a term or condition offered by the Indian government in its "pig iron package." Since the Indian government was offering pig iron *being produced in India,* there would be no need to include an ocean freight term or condition for delivery to Indian exporters. Therefore, ocean freight would be a term or condition irrelevant to the FOB price-based Item (d) comparison at hand.

*Creswell Trading Co. v. United States,* 936 F.Supp. 1072, 1079 (Ct. Int'l Trade 1996) (*"Creswell III"*) (emphasis in original). The court also instructed Commerce to assess whether the inclusion of inland shipping costs in the domestic price constituted a countervailable subsidy. *Id.* at 1080.

On remand, Commerce reluctantly deducted oceanic shipping costs from the world market price and recalculated the countervailable portion of the IPRS rebates. *See Final Results of Redetermination on Remand Pursuant to Creswell Trading Co. v. United States,* at 4, 5 (Dept. of Commerce Sept. 30, 1996) (*"Creswell IV"*) ("Although we have followed the instructions of the court, we respectfully disagree with the court's interpretation of Item (d).... Pig iron that is sitting in a Brazilian port is not 'commercially available' to an Indian [castings] exporter."). Commerce also determined that no adjustment in its countervailability assessment should be made for inland freight. After noting that the Indian govern-

ment's domestic price included delivery to Calcutta, *id.* at 5, Commerce reasoned that:

> [t]he world market price for pig iron used in our remand, after deducting ocean freight, becomes an FOB price. Therefore, this world market price would include inland freight within the country of exportation (*i.e.,* inland freight from the foreign pig iron producer to the port of exportation.) Because both the Indian domestic price of pig iron and the FOB world market price of pig iron include inland freight, we determine that the terms of the Indian price are no more favorable than the world market FOB price with respect to the inclusion of inland freight. Therefore, no adjustment is warranted.

*Id.* at 7 (footnote omitted). The Court of International Trade sustained Commerce's oceanic shipping costs and inland shipping costs determinations. *Creswell Trading Co. v. United States,* 964 F.Supp. 409 (Ct. Int'l Trade 1997) ("*Creswell V*").

The Domestic Industry and the United States appeal to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5) (1994).

## DISCUSSION

■ In reviewing a decision by the Court of International Trade, this court applies anew the statutory standard of review applied by that court to the agency's decision. *PPG Indus., Inc. v. United States,* 978 F.2d 1232, 1236 (Fed.Cir.1992). Therefore, we must affirm the court unless we conclude that the agency's determination is not supported by substantial evidence or is otherwise not in accordance with law. *See* 19 U.S.C. § 1516a(b) (1994). The issues before us, including the proper construction of Item (d), are issues of law, which we review *de novo.*

■ Appellants collectively cite various errors in the court's decision. First, the Domestic Industry argues that the entire rebate constitutes a countervailable subsidy, citing *RSI (India) Pvt., Ltd. v. United States,* 876 F.2d 1571 (Fed.Cir.1989). Second, the Domestic Industry and the United States argue that the court erred in sustaining Com-

merce's remand determination that the amount of oceanic shipping costs that were omitted in the computation of the IPRS rebates did not constitute countervailable subsidies. Third, the Domestic Industry argues that the court erred in sustaining Commerce's remand determination that the amount of shipping costs within India that were omitted in the computation of the IPRS rebates did not constitute countervailable subsidies. The Importers argue in response that *RSI* is factually distinguishable, and submit that the proper construction of Item (d) warrants the conclusion that both oceanic and inland shipping costs are not countervailable subsidies.

We first address the Domestic Industry's argument that *RSI* mandates that the rebates are wholly countervailable. *RSI* involved the same IPRS program at issue in this appeal, albeit for imports occurring in a different year. In *RSI,* the Indian government used a single purchase by the government in its computation of a world market price. *RSI,* 876 F.2d at 1572. Moreover, the Indian government assumed that the percentage of pig iron used in exported articles was 70 percent by weight, but evidence showed that actual consumption was "significantly lower." Accordingly, Commerce could not accurately determine whether the rebates provided by the Indian government to its exporters were nondistortive of market forces, and consequently found the rebates to be completely countervailable.

The Importers in *RSI* argued on appeal to this court that Commerce was required to determine a world market price for pig iron and to determine the amount of pig iron used in the exported articles in order to determine those portions of the rebate that were excessive under Item (d) and therefore countervailable. *Id.* at 1572–73. Commerce responded that it did not have to make such "imaginary" calculations and that the law did not require it to "postulate a calculation RSI made no attempt to construct in the real world." *Id.* at 1573. We agreed with Commerce and held that the entire rebate constituted a countervailable subsidy. We stated the "significant point" to be that Commerce was under "no duty to construct an imagi-

nary noncountervailable subsidy when the real subsidy is not shown to have been constructed in any such way and can not be shown to be nondistortive of market forces." *Id.* at 1574.

The Domestic Industry asserts that *RSI* applies to the 1985 rebates at issue in the present appeal because substantial record evidence not considered by Commerce reveals that the rebates bore no relation to world market prices and to the consumption of pig iron by the castings manufacturers.[2] The Importers respond that substantial evidence supports Commerce's computation of the countervailable portions of the rebates and that *RSI* does not preclude Commerce from determining the actual amount of pig iron consumption for which the rebates were appropriate.

We agree with the Importers. First, Commerce in this case had a significantly greater amount of data at its disposal to assist it in computing the countervailable portion of the rebates than it did in *RSI*:

> The [Commerce] Department sent questionnaires to respondents [the Importers] seeking [information sufficient to evaluate the IPRS program for 1985–89,] reviewed all of the information submitted by respondents in response to the questionnaires, considered comments and information submitted by petitioners in respect to respondents' questionnaire responses, and finally conducted a verification of information submitted by respondents.

*Creswell II,* at 11. Second, Commerce had reliable data from which to assess the pig iron consumption of each of the importers, and was able to hold countervailable those portions of the rebates that did not correspond to pig iron consumption:

> Because IPRS rebates are received for scrap, as well as for pig iron, and there is no separate IPRS program for scrap, we determine that the IPRS rebates received by Indian castings producers are exces-

sive. Using total figures for scrap and total pig iron used by each castings exporter, we have calculated the amount of each rebate that is attributable to pig iron consumption.

*Id.* at 5. Third, Commerce had ample evidence to conclude that the world market prices used by the Indian government in computing rebates were reliable:

> We reviewed actual purchase contracts for pig iron imported into India and determined that the prices in these contracts were comparable to the prices used by the [Indian government] to establish IPRS international prices. We also reviewed the excerpts of Monthly Statistics of Foreign Trade of India, published by the Indian Ministry of Commerce ... which were submitted by petitioners ... and determined that the prices in these statistics were comparable to the IPRS international prices for each time period.

*Id.* at 11. Commerce's methodology was sound and was based on substantial record evidence. Thus, *RSI* is factually distinguishable from the instant appeal. Here, sufficient data exists for Commerce to construct a countervailable subsidy that properly reflects economic realities in a manner not distortive of market forces.

Finally, the Importers are correct that *RSI* does not preclude Commerce from attempting to construct the portion of the rebate that is countervailable under Item (d). *RSI* merely holds that Commerce need not fabricate such a subsidy construction when it lacks sufficient data to link economic realities to the amount of the subsidy; it does not preclude Commerce from doing so when it has sufficient economic data to do the job correctly, as it did in this case. Accordingly, we conclude that *RSI* does not require Commerce to find that the 1985 rebates at issue were wholly countervailable and we affirm the court's resolution of this issue.

---

**2.** More specifically, the Domestic Industry submits that: (1) the casting manufacturers used varying amounts of scrap iron; (2) the price of pig iron varies according to purity, therefore making it improper to rely on a single world market price in determining the rebate; (3) the Indian government's world market price was not comparable with Indian pig iron import statistics, was not based on contemporaneous transactions, was not based on a normal exporter's requirements, was not based on any actual transactions, and was not mindful of oceanic shipping costs.

■ We next address whether oceanic shipping costs and inland freight costs are countervailable subsidies under Item (d), which we repeat here for easy reference:

(d) The delivery by governments or their agencies of imported or domestic products or services for use in the production of exported goods, on terms or conditions more favourable than for delivery of like or directly competitive products or services for use in the production of goods for domestic consumption, *if (in the case of products) such terms or conditions are more favourable than those commercially available on world markets to their exporters.*

(emphasis added). The parties do not dispute that the Indian government through operation of the IPRS program effectively provided pig iron to its castings manufacturers for export production on terms more favorable than it did for the same manufacturers to engage in domestic production. In other words, the parties do not dispute that the portions of Item (d) not emphasized above have been met. Instead, the parties only dispute whether the Indian government, by its failure to include oceanic and inland shipping costs in its world market price, provided an excessive rebate to its castings exporters, and thereby provided pig iron to its castings exporters on terms or conditions more favorable than those commercially available to those exporters on world markets.

The Domestic Industry's and the United States' primary argument is that pig iron procured on world markets is only "commercially available" to Indian castings manufacturers when it has been delivered to their doorsteps. They assert that a castings exporter who procured pig iron on the world markets would have to pay for the costs of shipping that iron to its plant. They conclude that a world market price which does not include these shipping costs is thus artificially low, and accordingly that the Indian government's rebate was excessive by this amount. The Importers' primary response

mirrors the Court of International Trade's rationale: oceanic shipping costs are irrelevant to Item (d) because the Indian government's "pig iron package" as effectuated through the use of the IPRS rebates compelled the purchase of pig iron by castings manufacturers from domestic sources, thus obviating the need for oceanic shipping. The Importers also note that it is illogical to include oceanic shipping costs in the world market price because this would cause the world market price to vary in accordance with the port from which pig iron was exported to India.

We agree with the Domestic Industry's and the United States' construction of Item (d) and conclude that the Court of International Trade erred in holding that the oceanic shipping costs did not constitute countervailable subsidies under Item (d). Item (d) specifies that delivery of products [3] by a foreign government to exporters on terms or conditions more favorable than are "commercially available" to those exporters on the world markets constitutes a countervailable subsidy. Item (d) thus recognizes that foreign governments may subsidize their domestic industries to allow them to compete effectively on the world market as long as the extent of the subsidization is not more favorable to their exporters than if those exporters had to participate in the world market without assistance. If the amount of the subsidization exceeds this point, it is excessive and this excessive amount is countervailable under Item (d). Accordingly, Item (d) mandates a comparison between the terms and conditions under which product was supplied to exporters by their governments and the terms and conditions to which those exporters would have been subject had they instead participated in the world market.

Because the latter set of terms and conditions is merely hypothetical, the argument that oceanic shipping costs are irrelevant because the pig iron used by the castings manufacturers was not shipped to India from

---

**3.** The parties do not dispute that there is no difference for purposes of the application of Item (d) between the Indian government delivering domestically produced pig iron to its casting exporters on favorable terms, and the Indian government providing a rebate to those casting exporters who use domestically produced pig iron.

overseas misses the boat. The whole point of the inquiry under Item (d) requires a comparison of the price of pig iron available in India with a constructed world market price. Obviously, pig iron procured by an Indian castings manufacturer from a foreign port would have to have been shipped overseas to the castings manufacturer.

A castings manufacturer procuring pig iron on the world market would have to pay the FOB price for the pig iron itself, plus the cost of shipping that iron to India. Accordingly, the world market price must include the cost of shipping. To the extent that the Indian government's world market price did not include oceanic shipping costs, its world market price was artificially low and its rebate artificially high by this amount. The price of pig iron that is not delivered to India cannot be fairly compared with the price of pig iron that is delivered. Thus, because of the omission of oceanic shipping costs from the calculation of the world market price, the IPRS program has in effect provided pig iron to India's castings manufacturers on terms more favorable than had those manufacturers actually procured pig iron on the world market.

It is true, as the Importers note, that inclusion of oceanic shipping costs in the world market price may cause the calculated world market price to vary with the distance the pig iron may have to travel. However, Commerce apparently did not find this to be an insurmountable problem considering that, prior to reversal by the Court of International Trade, it was able to compute a world market price which included oceanic shipping costs. More importantly, a cost that varies with the distance traveled is a realistic market cost. We therefore reverse the court's decision that the oceanic shipping costs were not countervailable subsidies under Item (d).

■ The same logic compels a conclusion that a castings manufacturer participating in the world market would have to pay the cost of shipping the pig iron from Calcutta to his plant, and therefore that inland shipping costs can in principle also constitute countervailable subsidies. However, on this record, we agree with the Importers and the Court of International Trade that the costs of ship-

ping pig iron within India are not countervailable subsidies. The record reflects, and the parties do not dispute, that the Indian government's domestic price included the cost of shipping iron to Calcutta. Likewise, the world market price, adjusted according to our above conclusion to include oceanic shipping costs, should also include the cost of shipping to Calcutta. They are thus comparable prices. Neither price includes the cost of shipping from Calcutta to the castings manufacturers. Therefore, whether the pig iron is obtained domestically or on the world market, a castings exporter purchasing pig iron would have paid a delivered price to Calcutta, and would have to pay the costs of shipping the pig iron from Calcutta to his plant as a separate cost. Because neither the domestic price nor the calculated world market price includes the separate costs of shipping pig iron from Calcutta to the plants of the castings manufacturers, these internal Indian shipping costs are therefore not countervailable subsidies. The rebates, which reflect the differences between these two prices, were not excessive by the amount of these costs. We therefore affirm the court's decision that the failure to consider the cost of shipping pig iron within India as a countervailable subsidy was not erroneous.

We have considered the parties' remaining arguments, but find them unpersuasive.

## CONCLUSION

The Court of International Trade erred in affirming Commerce's remand determination that the amount of oceanic shipping costs did not constitute countervailable subsidies under Item (d), but did not err in affirming Commerce's remand determination that the amount of the costs of shipping within India did not constitute countervailable subsidies. Accordingly, the decision of the court is

*AFFIRMED–IN–PART, REVERSED–IN–PART.*